ANNIE THYNG *vs.* FITCHBURG RAILROAD COMPANY.

Suffolk.    January 20, 1892. — February 25, 1892.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Personal Injuries — Loss of Life — Due Care — Negligence of Fellow Servant
— Employers' Liability Act.*

Where a brakeman on a railroad who was engaged in the performance of his duty received injuries and died from the effects thereof, and there was nothing to show that he was careless or that he ought to have done a particular act by way of precaution, it was *held* that the jury might infer that he was in the exercise of due care when the accident occurred.

Where an accident happened by the breaking apart of a freight train, the two cars between which the coupling gave way not belonging to the defendant railroad, it was *held*, in a suit by the administratrix of a brakeman to recover for his death and sufferings caused by the accident, that, if there was a defect in the original construction of either of the cars, the defendant was not liable for it, if proper provision was made for the inspection of the cars, and for the safety of the defendant's employees while using them. *Held, also,* that the manner of using cars received from other corporations, as well as its own, might be left by the defendant to competent servants, and that when proper pins for the coupling of cars were supplied, the failure to use them properly, or to replace one too short by a longer one, was the fault of the defendant's servants who used them, and not of the defendant.

The St. of 1887, c. 270, § 1, cl. 3, which relates to accidents that happen "by reason of the negligence of any person in the service of the employer who has the charge or control of any signal, switch, locomotive engine or train upon a railroad," seems chiefly to contemplate the danger from a locomotive engine or train as a moving body, and to provide against the negligence of those who, either wholly or in part, control its movements.

TORT, by the administratrix of the estate of Frederick Thyng, to recover for his death and suffering from injuries received while in the defendant's employ as brakeman.

At the trial in the Superior Court, before *Barker*, J., there was evidence tending to show that, on July 3, 1889, the intestate was the rear brakeman on a train of freight cars which was near the station at Concord, and was going from six to eight miles an hour ; that the seventh car from the end broke apart from the car ahead of it; that neither of these cars belonged to the defendant; and that the intestate who was on the front end of the seventh car fell between the cars, and was found badly injured under the forward truck of the seventh car, and subsequently died.

Charles Dean, conductor of the train, testified:

" On the seventh car there was a double-mouthed drawbar. On the eighth car was a single-mouthed drawbar. The pin and link in the rear end of the eighth car were right, and in place. I did not see the pin used in said double-mouthed drawbar. One of the men threw it down the bank, and got another pin. I got the other pin from the caboose. The new pin that was put in the double-mouthed drawbar might have stuck out from the bottom of the drawbar fully half an inch, or perhaps an inch. I have been conductor on this train about seven years, and am familiar with the double-mouthed drawbars. When new, they have an ordinary pin about ten inches long, though I never measured one. It comes down from the bottom of the drawbar so that you can see the end of it. They vary a good deal in length. When new, they have a pin chained to the car that comes down about an inch from the drawbar. The seventh car was a refrigerator car. There was a frog on the top of the hill, nearly a mile east of the Concord station : we call it the sand-hill. We passed that at about fourteen or fifteen miles per hour. The grade from that point to the Concord station is about thirty-seven feet to the mile, down grade. The single-mouthed draw-bar does n't always need as long a pin as the double-mouthed bar. The mouth of the single drawbar came about even with the lower jaw of the double drawbar. In coming down such a grade as that, the cars will not bump into each other, because the train is held back by the rear end. They put on the brakes at the top of the hill. Brakes were put on somewhere on the grade by the head man, I suppose, and the middle man. The rear man always holds the train down grade from the rear end. In passing frogs and switches, a pin will jump up and down, more or less ; sometimes it will hop up and we cannot find it, and other times it will hop up and stick right on the dead wood which comes across over the top of the drawbar. A pin is more liable to hop up when a slack is loose than when it is tight. I never knew one to hop up when the train was tight: My attention was called to the breaking apart of the train because we stopped so quickly and made such a sudden jerk, the rear end of the train not running more than twenty or thirty feet.

" Double drawbars are common on the road. Thyng worked

for me about two years, and had worked as a brakeman before he worked for me. It was part of his duty as a brakeman to shackle and unshackle cars. The same sort of pins are ordinarily used with double-jawed drawbars as with the single. We don't make any distinction if the pin comes down through. We have an extra supply of pins on the train, kept in the caboose and on the engine. When making up trains in the yard there are always pins and links lying around. If I was making up a train myself, and saw that there was an imperfect pin in a certain place, I would get another and put it in the place of it. That has always been the rule. . . .

"I think Thyng would not have anything to do with making up or shackling this train. I believe there was a switching engine made up the train. After the train is started, it is the duty of all to look up the couplings, and see that the train is made up right. I had charge of the caboose where the pins and links are kept. I said the pins were lying around in the yard, no particular place for them. There are more or less pins, always some, around where you can find them. There is no particular place for any particular kind. You can find almost any kind of a pin or link any time in the yard."

William H. Campbell and Charles A. Wakefield, head and middle brakemen testified in corroboration, Wakefield testifying as follows: "On the seventh car was a double-mouthed drawbar. The coupling on the eighth car was all right. On the coupling of the seventh car I found that the pin was up a little, resting on the edge of the hole, — on the upper edge of the lower hole. The pin was slightly bent, — very slightly, I should judge. It fitted the hole loosely, but not as loosely as some. I threw the pin away, down the bank. It was not bent so that we could not use it. It was twelve inches long, or a little over. I think it came even with the bottom of the drawbar. Should say the end of the pin was mostly square."

Dean, recalled, testified: "The conductor of the switching engine had charge of making up the freight trains in the yard. As conductor of this train I had nothing to do with making it up in the yard; my duty first commenced when the train was made up. It is the business of all of us to see that the train is all right. As the train passes out of the yard, we watch it and

see that it goes all right. At that time the brakemen are on the train at their brakes in their places. The brakemen who go on the train do not have anything to do with making up the train or inspecting it before it leaves the yard."

The pin which the witness Wakefield threw away was shown to the witness, who testified that it was about the average length, and was such a pin as is ordinarily used on double-mouthed as well as single-mouthed drawbars.

The defendant requested the court to rule that the plaintiff could not maintain her action. The court so ruled, and ordered a verdict for the defendant; and the plaintiff alleged exceptions.

*H. W. Bragg & R. Bradford*, for the plaintiff.

*G. A. Torrey*, for the defendant.

KNOWLTON, J. There was evidence from which the jury might have found that the plaintiff's intestate was in the exercise of due care. He was engaged in the performance of his duty, and there was nothing to show that he was careless, and the case is not one which makes it incumbent on the plaintiff to prove that he did a particular act by way of precaution. *Maguire* v. *Fitchburg Railroad*, 146 Mass. 379.

The accident happened by reason of the breaking apart of a freight train. The two cars between which the coupling gave way were foreign cars, and did not belong to the defendant. If there was a defect in the original construction of either of them, the defendant was not liable for it, if proper provision was made for the inspection of them, and for the safety of the defendant's employees while using them. *Mackin* v. *Boston & Albany Railroad*, 135 Mass. 201. One of the cars had a double-mouthed drawbar, that is, a drawbar fitted with two openings, one above the other, to receive the link from the drawbar of the next car, with a view to the better adjustment to each other of cars of different heights. There was evidence that a double-mouthed drawbar requires a longer pin than an ordinary single-mouthed drawbar, and that the accident may have happened in this case because the pin used in the double-mouthed drawbar did not extend down far enough to keep its place at the bottom of the bar. The jury might have found that there was negligence in the use of too short a pin in making up the train; and it is contended that they might have held the defendant responsible for that negligence.

If there was a negligent failure to provide a proper pin for the drawbar when the car was built, or at any time before it came into the charge of the defendant, it was the fault of the corporation which owned the car, and not of the defendant. The manner of using cars received from other corporations, as well as its own, might be left by the defendant to competent servants. If supplies were needed to enable its servants safely to use the cars the defendant was bound to furnish them. Nothing was needed in the present case but a longer coupling pin. There was no evidence that there was any failure on the part of the defendant to supply such pins for the use of its servants in making up trains. On the contrary the evidence was undisputed that pins of different lengths were supplied. The witness Dean testified : " We have an extra supply of pins on the train, kept in the caboose and on the engine. When making up trains in the yard there are always pins and links lying around. If I was making up a train myself, and saw that there was an imperfect pin in a certain place, I would get another and put in the place of it. That has always been the rule. . . . You can find almost any kind of a pin or link any time in the yard." ·Campbell said : " We have pins of all the different lengths known, on the train, or lying about where we could get them." Wakefield testified that after the accident he got a new pin from the caboose, which came four or five inches below the bottom of the drawbar, and in this he was corroborated by Dean. Upon the undisputed evidence, the men who made up the train could easily have got a longer pin in the yard, or from the caboose which was going with the train. When proper pins for the coupling of cars were supplied, the failure to use them properly, or to replace one too short by a longer one, was the fault of the defendant's servants who used them, and not of the defendant.

The plaintiff seeks to charge the defendant under that clause of the statute (St. 1887, c. 270, § 1, cl. 3) which relates to accidents that happen "by reason of the negligence of any person in the service of the employer who has the charge or control of any signal, switch, locomotive engine or train upon a railroad." It is not contended that it was the duty of the conductor of the train which broke apart to inspect the couplings between the cars after the train started, and the proof was that his duties in reference to

the train began when it was ready to start. The only person to whom the plaintiff's contention relates is the conductor of the switch engine, who has charge of making up freight trains in the yard. Is his negligence in making up a train negligence of a person in charge or control of a locomotive engine, or train, within the meaning of this statute? The liability exists only when the negligence is in the management of the matters which are mentioned as in the employee's charge or control. The fact that he is a person who is accustomed to have such charge and control does not enlarge the liability of his employer so as to include responsibility for the results of his negligence in respect to other things. A conductor of a switch engine which is drawing several cars under his direction may be, for the time, in charge of a train consisting of the engine and cars. *Dacey* v. *Old Colony Railroad*, 153 Mass. 112. But there is nothing to show that this conductor of a switch engine was at any time negligent in his charge or management of such a train, or of the engine attached to it, or that his conduct in reference to such a train had any connection with the accident. His only relation to the train on which the plaintiff worked was to bring the cars together and make the train up. His duties were ended as soon as the cars were connected so as to make a train. He never had charge or control of those cars as a train, but he was to determine what cars should be brought together to constitute the train, and see that they were properly coupled and ready to be taken away. The statute, in referring to a " signal, switch, locomotive engine or train," seems chiefly to contemplate the danger from a locomotive engine or train as a moving body, and to provide against the negligence of those who, either wholly or in part, control its movements. The charge or control is of that whose characteristic is rapid and forceful motion. It relates to the train or locomotive engine as a whole, and not to the individual parts which make up the train or engine. The statute might have been made to include those who have charge of the construction of the engine or the cars or who inspect them. Neglect of their duties would be likely to cause an accident to the train while in motion. But the Legislature in this part of the statute has gone no further than to include those whose duties relate to the charge of a locomotive engine or the train when

complete.  The conductor of the switching engine was at no time in charge or control of the train on which the plaintiff worked.  Looking at all the particulars of the defendant's conduct, we can see no evidence on which the corporation can be charged in a suit brought by one of its servants.  The principle by which *Griffin* v. *Boston & Albany Railroad,* 148 Mass. 143, was governed, should not be applied to a case like the present.  The fact that a freight train broke apart when it ought not to is some evidence of negligence for which the railroad would be liable in a suit brought by one who is not an employee.  But if nothing more appears, it does not indicate negligence of the corporation for which it is liable to one of its servants, as distinguished from negligence of a servant for which it is not liable to another servant.  In a case like the present, where the only culpable cause to which the accident can be ascribed is the use of too short a coupling pin on a car of another corporation, it points to negligence of a fellow servant quite as much as to the negligence of the corporation itself.

The persons who made up the train were fellow servants of the plaintiff's intestate, and the ruling at the trial was correct.

*Exceptions overruled.*