WILLIAM A. PERRY *vs.* OLD COLONY RAILROAD COMPANY.

Suffolk.    March 27, 28, 1895. — September 14, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Personal Injuries — Railroad — Negligence — Employers' Liability Act.*

The fact that the foreman of repairs in a roundhouse of a railroad corporation did
not notify the engineer or fireman of a locomotive engine, which was stalled in
the roundhouse for repairs, that he had sent A., a laborer in the employ of the
corporation, under the engine to do some repair, they knowing that some one
would be so sent, and it not being customary to give such notice, or the fact that
he did not notify A. that the engine would have to be blown down before the
repair was made, and that this was as likely to be done in the roundhouse as
elsewhere, A. being aware of both these things, show no negligence on the fore-
man's part upon which to found an action against the corporation under the
employers' liability act, St. 1887, c. 270, for injuries occasioned to A. by being
scalded with steam and hot water blown from the engine while making the
repair in question.

A locomotive engine, which is stalled in the roundhouse for repairs, is not "upon a
railroad," within the meaning of the employers' liability act, St. 1887, c. 270,
§ 1, cl. 3.

TORT, for personal injuries occasioned to the plaintiff, while
in the defendant's employ, by being scalded with steam and hot
water from a locomotive engine. The declaration, which was
under the employers' liability act, St. 1887, c. 270, contained
three counts, the first and third alleging that the injury was
caused by the negligence of a person intrusted with and exer-
cising superintendence, and whose sole or principal duty was
that of superintendence; and the second alleging that the injury
was caused by the negligence of a person having charge or con-
trol of a locomotive engine upon the defendant's railroad. Trial
in the Superior Court, before *Sherman*, J., who allowed a bill of
exceptions, in substance as follows.

The plaintiff testified that he had been employed for some
years as a laborer in the defendant's roundhouse; that his duties
were jobbing around, and doing anything he was told to do;
that on December 21, 1892, he was ordered by Charles Noyes,
who was the foreman of repairs in the roundhouse and had
charge of the repairs of engines, to go and see what was the

matter with the heater pipe of a certain engine, which was then standing on one of the pits in the roundhouse; that he got his tools and went under the engine on the left hand side, between the driving wheels and the forward trucks; that he said nothing to anybody when he went under, and then saw no one else near or on the engine; that he went back under the ash-pan to the heater pipe, which was between the engine and tender and right beside the blow-off cock, which came down between the two rear drivers of the engine; that he had been at work there on the heater pipe five or ten minutes when the steam and hot water came down on him from the blow-off cock and scalded him; that "when engines come in they usually take in coal and water, and back into the roundhouse, and the engineer most generally reports what repairs are necessary"; that "the engineer gives a slip to the engine despatcher, stating what repairs are needed, and he gives it to Noyes, who orders the work done"; that "if the engineer wants to blow her down, he does it in the pit"; that "an engine has to be blown down when a check is to be ground in"; that "an engineer, as a matter of custom or practice, has no duties in the roundhouse any more than if he has a little job on his engine to do, he does it"; that "there is no custom as to what a man shall do when he goes under an engine, — go and do his work, that is all"; and that "there is no custom with relation to what a laborer shall do when he goes under an engine, with regard to water and danger."

William J. Mahar, a witness for the plaintiff, testified that, at the time of the accident, he was employed in the roundhouse as a machinist, and worked on repairs there; that engines were repaired there as far as they could be, and what could not be done there was done in the machine shop; that when an engine came in and needed repairs, the engineer generally reported them to the foreman of repairs or to the engine despatcher on a slip left in his office; that this slip contained a statement of what he wanted done; that from the despatcher it went to the foreman of the roundhouse, and then to the person who did the work; that he could not say that all these slips passed through the foreman of the roundhouse, but as a general rule they did; and that sometimes he gave the slip to the man ordered to do the work, and sometimes not.   The witness further testified as

follows: " If there is no work to be done on the engines, they are put in the roundhouse with the fire and water in them, ready to go out on a trip. If they are to remain there for any repairs, they generally take the fire out, most always before going into the roundhouse. The hot water and steam are blown off, sometimes outside, sometimes inside, according to circumstances. When there is a check to be ground in, I have seen it blown off after they have crossed the house and gone into the yard, so as not to interfere with anybody. I have seen an engine blown off in the house when a check was to be ground in. There was no general practice ; sometimes the water was let off in the ash-pit, sometimes in the house, and sometimes they used to go beyond the house. Under an engine is a very dangerous place. I never heard of any custom, and do not know of any practice, with regard to the duty of a workman with reference to the hot water and steam, when he receives orders to go under an engine."

On cross-examination, the witness testified : " All repairs that can be made comfortably in the roundhouse are made there without taking the engines to the shop, and that sometimes requires men to be at work on the engines in one part of them and sometimes in another ; so that, when a man goes under an engine, there may be half a dozen inside or on top at the same time. Each man looks out for himself where he goes. I knew there were people in the cab of this locomotive, for I heard voices a little before the plaintiff was hurt."

James F. Bailey, a witness for the plaintiff, testified as follows : " I had been in the employ of the defendant as locomotive fireman for two years and a half prior to June, 1893. I was in the roundhouse when the plaintiff was hurt. I was just up on the engine he was working on. I got down off that engine and went across to my own engine, and got ready to go out of the roundhouse. The first thing I heard was the steam blowing, and just as soon as the steam cleared away I saw the plaintiff coming up from under the engine. I did not see him go under the engine. When I went on the engine, the one from under which he came, Rodney Straw was packing the throttle, a fellow named Moore, and a man named Bates, and a man who run the hoisting engine on the dump, and myself, were on her. Straw

run the engine.  I saw Straw was packing the throttle, but I did not know of any other repairs to be done on that engine.  A man came along to do some work on her, and said there was too much water in her, and Straw said, ' I will blow her down.'  I am familiar with the duties of the engineer on this railroad. When an engine comes in after a trip she is put on the coal track, and the engineer generally gets off there and turns her over to the fireman.  She takes coal and cleans the fire; if she is to be hauled in, the fire is banked, and then she backs in and takes water and goes to the turn-table and is turned around, and will either be put on the pit or put out in the yard.  The practice about blowing down the engine when repairs are to be done depends upon what the repairs are.  When an engine has to have a check ground in, and other repairs, the duty of the fireman about blowing her down would generally be for him to wait until he got in the pit.  The engineer would know if it was necessary for a check to be ground in.  They don't have any regular time, with reference to the time of the engines going into the roundhouse, for doing this.  It is a common occurrence to see them blowing off the engine in the roundhouse.  An engine that requires a check ground in would be blown down as soon as the engine came in.  It is the engineer's duty to blow down.  When the engine goes into the roundhouse she is generally assigned to a pit, and generally the tender brake is set up and the wheels blocked, and the engineer goes off for the day, and then the engine is in the charge of the engine despatcher. The engineer usually packs his own throttle."

The defendant offered no evidence, and requested the judge to rule that the plaintiff could not recover.

The judge declined so to rule, and submitted the following questions to the jury:

" 1.  Was Noyes, the foreman of repairs, negligent?

" 2.  Was the engineer, Straw, in charge and control of the engine under which the plaintiff was hurt at the time, and, if so, was he negligent with reference to such charge and control?"

The jury answered both questions in the affirmative, and found for the plaintiff; and the defendant alleged exceptions.

The case was argued at the bar in March, 1895, and afterwards was submitted on the briefs to all the judges.

*J. H. Benton, Jr. & C. F. Choate, Jr.*, for the defendant.

*H. L. Boutwell*, for the plaintiff.

MORTON, J. This is an action for personal injuries, brought under St. 1887, c. 270. There are three counts in the declaration. The first and third counts allege negligence on the part of a person intrusted with and exercising superintendence, who it appeared was one Noyes, the foreman in charge of the round-house. The second count alleges negligence on the part of a person who had charge or control of a locomotive engine upon a railroad, who it appeared was one Straw, the engineer of the engine under which the accident happened.

The evidence all comes from the plaintiff and his witnesses. It is nowhere expressly stated what was the nature of the repair which the plaintiff was sent to do upon the engine, but from the fact that the repair principally referred to in the testimony was the grinding in of a check, we infer that that was, in part at least, what the plaintiff had to do; and we assume that Noyes knew it, either in the customary way, by a slip from the engineer, or in some other manner. It is said that when he sent the plaintiff to do the job, he should have given notice to the engineer or fireman that he had been sent. But both the engineer and fireman knew that some one would be sent by the foreman to do the repair; and it hardly would seem necessary for the foreman to notify them that he had done what in the ordinary course of things they had every reason to expect he would do. There was nothing to show that there was anything unusual about the job, or manner or place of doing it. The place was dangerous, but the plaintiff knew that. He also knew that the engine would have to be blown down if a check was ground in, and that that was done over the ash-pit as commonly as anywhere. There was no negligence on the part of the foreman in failing to notify the plaintiff of what he well understood himself. There was nothing to show that it was customary, when men were sent to grind in checks, to notify the engineer or fireman, or anybody else, of the fact, and that they must be careful about blowing down, or that it had ever been done before, or that anything was omitted in this case on which the men habitually relied or had a right to rely. There was testimony that the workmen looked out for themselves, as they needs

must in many things.  Some details a foreman may safely ignore, or leave to the men over whom he has charge.  We discover no evidence of negligence on the part of Noyes.

In the next place, even if Straw was negligent in blowing down, which we do not decide, we do not think that he had charge or control of a locomotive upon a railroad track within the meaning of the act.  The statute, as it is said in *Thyng* v. *Fitchburg Railroad,* 156 Mass. 13, 18, " seems chiefly to contemplate the danger from a locomotive engine or train as a moving body, and to provide against the negligence of those who, either wholly or in part, control its movements."  This engine was stalled in the roundhouse for repairs, and was not upon a railroad track as the words ordinarily are used.  The case would be different, perhaps, if it had been standing on a track, waiting to be coupled to a train, or for some temporary purpose.  If the engine had been in the repair shop, no one, we think, would contend that it was upon a railroad track within the fair meaning of the act.  The fact that it was in the roundhouse instead, where such repairs were made as could be made comfortably, does not, it seems to us, make any difference.  It is also a matter of great doubt whether the engine was in the charge or control of Straw.  The testimony tended to show that, when an engine came into the roundhouse, it was generally assigned to a pit, the tender brake set up and the wheels blocked, and then the engineer went off, and the engine was in charge of the train despatcher ; or, as the plaintiff put it, " an engineer, as a matter of custom or practice, has no duties in the roundhouse any more than if he has a little job on his engine to do, he does it," which is far from saying that in the roundhouse he has charge or control of the engine.  The blowing down of the engine was in response to an outside suggestion, and might as well have been done by any one else for aught that appears.  But even if the engine was in charge or control of Straw, that is not sufficient.  In order to make the defendant liable, it must also have been upon a railroad track, which we do not think it was.

The views expressed above render it unnecessary to consider the question of the plaintiff's due care.

The result is, that a majority of the court think the exceptions should be sustained, and it is

*So ordered.*