[No. 3321.]

## DENVER & RIO GRANDE RAILROAD CO. V. VITELLO.

1. NEGLIGENCE—*Complaint—Certainty.* A complaint charging an act of defendant injurious to plaintiff, with a general allegation of negligence therein, is sufficient as against a general demurrer, though no details of the particulars of the act are given, unless the acts alleged are such as cannot involve negligence under any state of facts provable under the allegations of the complaint. If a motion to make more definite and certain is interposed, the particulars of the negligence must generally be set forth. But otherwise if the facts are presumptively within the knowledge of the defendant, and such that plaintiff cannot be presumed to have knowledge thereof.

Complaint against a railway company by the widow of a trackman killed by the derailment of a car, negligently permitted *to escape and run wild down a declivity to a curve where de- ceased was at work,* held sufficient upon such motion, though failing to set forth the name of the negligent servant.

2. APPEALS—*Harmless Error.* Action against a corporation for negligence occasioning the death of plaintiff's husband, while a servant of defendant. The complaint failed to set forth the name

of the particular servant culpable in the premises. Motion to require ·a more specific statement in this respect was· denied. But in a former appeal the culpable servant had been named by the defendant· itself. Held that the denial of the motion, even if erroneous, was harmless.

3. —— *Law of the Case.* Expressions of the Supreme Court in the.same case as to the effect of the evidence, in the opinion given upon a former appeal, the record in which presented substantially the same state of facts as the present record. Held the law of the case.

4. MASTER AND SERVANT—*Liability of Master to Servant for Negligence of Fellow Servant.* The Fellow Servant Doctrine is purely a rule of the courts, never sanctioned by express legislation. In determining whether·it shall be extended or limited, not only the reason of the rule, but the expressions of the legislature are to be taken into consideration. The legislation of the state considered, and held to express disapproval of the doctrine, and its final abolition. The court, in view of this legislation, declined to extend the doctrine even to a case occurring before the enactment of the last statute.

5. —— *Who Are Fellow Servants.* Those who operate in distinct departments are not. The doctrine of *Chicago Co. v. Monanda,* 93 Ill. 302, approved.

6. STATUTES—*Construction.* In the interpretation of a statute the opinion of the court of another state construing a similar enactment, but afterwards rejected and set aside by the legislature of that state, will not be accepted.

7. —— *Construed.* A brakeman was left in temporary but sole control of the cars of a train at a railway siding, and from which the engine had been detached, where there was a declivity in the track. By his negligent failure to set the brakes, the cars moved down the declivity and occasioned the death of a trackman. Held that the cars standing unconnected, and so escaping, were a "train" and the brakeman "in charge and control thereof," within the meaning of sec. 2060, Rev. Stat.

*Appeal from Denver District Court.* HON. HUBERT L. SHATTUCK, JUDGE.

Mr. ELROY N. CLARK and Messrs. VAILE and WATERMAN, for appellant.

Mr. THOMAS M. MORROW, for appellee.

SCOTT, P. J., delivered the opinion of the court.

This case was before the supreme court upon a former hearing and is reported in 34 Colo. 50. On the 2nd day of May, 1901, and at Belden Siding on the road of the appellant, some men among whom was Vito Vitello, the husband of the appellee, were engaged in removing a mud and rock slide which had come down upon the track from the mountain side, which slide had occurred several days before. At this point the valley of the Eagle river is very narrow. Practically all of the valley between the mountain and the river was occupied by the tracks, of which there were three. These were in the form of a sharp curve, the main tracking being nearest the river. At the time and at the station of Red Cliff about one and a half miles west from Belden Siding and on an up grade, four cars and a caboose were detached from the engine and left on the main track in charge of a brakeman, named Dugan. This brakeman walked away and left these cars without setting the hand brakes and apparently paying no further attention to them, or in any way attending to his duties in that respect. Within fifteen to twenty-five minutes after the engine was detached and the cars left in charge of the brakeman, and apparently because of his failure to set the hand brakes, which it was his duty to do, and the air apparently having escaped from the airbrakes, these cars started down the track, and with constantly increasing speed, toward Belden Siding where Vitello and his associates were at work. The runaway cars were discovered barely in time for the workmen to step from the track. Two of the cars proceeded further than the others and were derailed near where the men were at work, the body of the cars

being thrown toward the mountain side and turned over, the trucks remaining on the track. One of these cars was loaded with scrap iron, such as is usually found from breakage and non-use in the operation of railroads, and which was afterward found spilled and scattered about on the ground. Immediately after the wreck of the cars the dead body of Vito Vitello was found. He had been struck on the head and killed. The accident occurred about ten o'clock in the morning and it appears that each morning after the ground on the mountain side had thawed, rocks at times came down upon the track of the slide, bounding and rolling, and occasionally into the river. It is one of the contentions in this case that Vitello may have been killed by one of such rocks.

It is strenuously urged by counsel for appellant that the complaint is not sufficient, in that it does not charge which of the employees of the defendant below were chargeable with the negligence complained of, and that the trial court erred in overruling the defendant's motion to require the plaintiff to make her complaint more specific and certain in that respect. The allegations under consideration are as follows:

"2. That on or about May 2, 1901, one Vito Vitello, husband of plaintiff, was employed by the defendant, as a section man, and was engaged in the duties of his employment on defendant's said road at a point about one and one-half miles northwest of Red Cliff, in said county of Eagle, and state of Colorado, near what is known as Belden Switch, at which point there is a curve in said road; that while said Vito Vitello was so engaged in his work for

defendant, the said defendant, its agents and employes, having charge or control of the train on its said road, negligently, carelessly and without fault or knowledge of the said Vito Vitello, and who was himself in the exercise of due care and diligence at said time, permitted said train to escape and to run wildly and uncontrolled, down a steep grade over its line of road where said Vito Vitello was so employed, at a high and dangerous rate of speed; that when the said Vito Vitello, and others, so employed with him, saw said cars approaching, they were unaware of the fact that they were running at a high and dangerous rate of speed, and stepped aside several feet from the track to permit the same to pass; but on account of the reckless, careless and negligent manner in which said cars were allowed to run, and the high and dangerous rate of speed they had attained when said cars reached the curve where said Vito Vitello was so employed, they jumped from the tracks of defendant and ran into and upon and over the said Vito Vitello, killing him instantly.''

This alleged error was apparently not urged in the supreme court upon the former hearing. An examination of appellant's brief in that case discloses no reference to this question. The ruling of the court now complained of occurred prior to the first trial.

The only case cited by appellants seeming to support this contention is that of the *A. T. & S. F. R. Co. v. O'Neill*, 49 Kas. 367. This case is not altogether in point, for there the failure of the complaint to designate the particular servant chargeable with the acts of negligence, was but one of other and more important alleged defects. It appears also

in that case that the plaintiff was present and working as one of the train crew at the time of the injury. In this case the deceased was working about one and a half miles distant and none of those present at the time of the accident, nor the plaintiff, could reasonably be expected to know which of the particular servants of the defendants' train crew, were chargeable with the fault, while on the other hand such information was peculiarly within the knowledge of the defendant. In fact all of the testimony upon this point was by servants of the defendant and members of the train crew at that time. It can not be the purpose of the law to require such rigid rule of pleading as will in any case be the equivalent of a denial of the right to a judicial hearing and determination of an alleged substantial right. To adopt this contention of the appellants in this case, would seem to be nothing less. To whom could the plaintiff go in the case at bar for such information as would meet the defendant's demand, except to the defendant or its servants engaged in the operation of its train. The defendant is here complaining of the insufficiency of the complaint in that particular, and the prudent management of a railroad is not to be expected to retain employees who willingly confess such negligence as endangers the lives of persons and destroys the company's property.

The authorities are not in harmony as to the proper method of pleading negligence. But the generally accepted rule seems to be that negligence, being the ultimate fact to be pleaded and not a mere conclusion of law, a complaint charging defendant with an act injurious to plaintiff, with a general allegation of negligence in the performance of the

act, is sufficient, at least as against a general demurrer for the want of sufficient facts, without stating the details or particulars of the act causing an injury, unless the particular acts alleged are such that they cannot be negligence under any possible state of facts, provable under the allegations of the complaint. It is true that the act done or omitted should be stated with a reasonable degree of particularity. This rule further requires that when a motion to make more definite and certain is interposed, raising the objection that the allegations are too general, the particulars of the negligence must be set forth, unless the facts are within the knowledge of the defendant, and are such that plaintiff cannot be expected to know them. The latter proviso seems applicable here. This doctrine finds substantial support in the following authorities: Cyc. 571-572-573; Am. & Eng. Enc. P. & P. 334 and 335; *Chicago City R. Co. v. Jennings,* 157 Ill. 274; *Cox v. Providence Gas Co.,* 17 R. I. 199; *San Antonio R. Co. v. Adams,* 6 Tex. App. 102; *Eldridge v. Long Island R. Co.,* 1 Sanford (N. Y.) 89; *Cedersen v. Ore. R. Co.,* 38 Oregon 343; *Missouri Pac. R. Co. v. Hennesy,* 75 Tex. 155; *Texas, etc., R. Co. v. Easton,* 2 Tex. Civ. App. 378.

On the former hearing it was contended by the appellant and determined by the supreme court that the negligent acts were those of appellants' brakeman, Dugan. The same contention is made here and we see no good reason to disagree with it. Clearly then upon this trial the defendant below was not prejudiced by the alleged error. Under the circumstances in this case we find no error in the rule of the court denying the motion of the de-

fendant to require the plaintiff to make her complaint more specific and certain.

A further contention of the appellant is that there was no evidence of the cause of Vitello's death, and that for this reason the court erred in refusing to direct a verdict for the defendant. We have read carefully the abstracts of the evidence, both in the present case, and upon the former hearing, and find no material or substantial difference upon this point. Upon the former trial the court instructed the jury that it appeared from the evidence that "the cars left the rails near the place where the plaintiff's husband was working, struck and killed him." This instruction was held to be error and the supreme court said:

"In as much as this case must be remanded for new trial we desire to state that the instruction of the court, as to what appeared from the undisputed evidence in the case, was perhaps too broad. It may be said that under the circumstances the direct cause of Vitello's death was a matter which was fairly disputable and one upon which reasonable minds might disagree. Counsel for appellant in their briefs argue with considerable vehemence that there was no proof that the death was caused by the train or that it was occasioned by the falling of rock from the mountain side. Counsel for appellee, with equal vehemence, argue the reverse. So long as there was a dispute as to that matter, the court should not have instructed the jury that the matter was undisputable."

We must regard this finding under the circumstances, as the law of this case, and hold that the trial court did not err in submitting this question

of fact to the jury; *Lee v. Stahl,* 13 Colo. 174; *Gutshall v. Cooper,* 48 Colo. 160; *Herr v. Graden,* decided at this term of court. Neither do we find any good cause for disturbing the finding of the jury.

Counsel for appellant further urge that the deceased Vitello, was a fellow servant with Dugan, the brakeman, whose negligence was the cause of the accident, and that for such reason the plaintiff is not entitled to recover.

Upon this question counsel for appellant and appellee present able and exhaustive arguments.

It appears to us that to apply the fellow servant rule under the facts in this case, is to materially extend an enlarge the application of that rule as heretofore applied by the appellate courts of this state. The determination of this question necessitates serious consideration and covers a field upon which we find but little to guide us in the adjudicated cases in our own courts. It is useless to try to reconcile the conflicting decisions of other courts upon this subject. Decisions of the courts in the various states of the Union, as well as in the Federal courts, are as widely opposite as the poles. In some instances it is not possible to reconcile decisions of courts in the same jurisdiction. Cases are cited in the briefs in this case, covering substantially the same state of facts as here, and which are exactly opposite in both reasoning and conclusion.

The fellow servant rule is purely a court rule and prior to its adoption, first by the courts of England, and later by the courts of the United States, the rule of respondeat superior applied equally to injuries sustained by servants, as well as to those sustained by strangers. We do not find that the

fellow servant rule has ever been sanctioned by statute either in England or in the United States. While on the contrary it has been abolished by statute in many states of the Union, including Colorado. Therefore in adopting either of the opposite contentions presented, we should, in the absence of a rule either by the supreme court or the court of appeals, take into consideration the expressed legislative will, as well as the reason of the rule.

By the act of 1877 the legislature of this state modified the rule, and by the act of 1893 still further modified and restricted it. By the act of 1901 the fellow servant rule was abolished altogether, and presumably by reason of the question as to the irregularity of the passage of that act, now pending in the state and federal courts, the act of 1911, reenacted the law of 1901, and seemingly in order to avoid any uncertainty as to the intent of the legislature, the same act repealed the act of 1893.

It will be thus seen that for more than ten years, and by two separate acts, the people of this state, acting through their legislature, have expressed their repugnance to the fellow servant rule and their determination to deny its application in any form. The accident involved in the case at bar, occurred before the act of 1901 became effective, although after its passage by the legislature and approval by the governor. We feel therefore, that this court should hesitate, in the face of the repeatedly expressed will of the law making power, before it determines to extend the application of such a rule beyond the limit of the cases now determined in our own courts.

We come now to the reason of the rule and must adopt one or the other of the widely divergent lines of reasoning found in the decision of the different courts of the country, and in this, our duty and our reason seem clear.

Vitello was employed temporarily with others, the day before the accident, to remove a rock and mud slide from the tracks of the defendant, at the Belden Siding, caused by the giving way of a mine dump on the side of the mountain, and which siding was a mile and a half distant through the canon from Red Cliff station, where the runaway cars were negligently permitted to escape by brakeman Dugan. Dugan was engaged in the operating department of the defendant company. Vitello was working in the track department. It is common knowledge that these are separate departments, wherein the company is represented by the train master in the one case and by its roadmaster in the other.

We are unable to agree that any of the reasons advanced for the fellow servant rule, at the time that rule was invented and announced, can apply to this state of facts.

Industrial advancement has been such since the origin of that rule that the reasons for it in any event, seem now to be far fetched and unsound, when applied to the relation of master and servant in the great industries of the present day. Then, the reaping hook and cradle were the only harvesting implements, as the first of them had been for centuries before; now, powerful machines drawn by horse and steam power, and manufactured in great establishments, employing vast numbers of operators in different and special departments, perform

such service.  Then, overland transportation of passengers and freight was by stage coach and wagon, with the horse and the ox as motive power, though the primitive engine operating on wooden rails was in the experimental stage; now, by great railroads stretching hundreds of miles in extent and employing men in many departments of construction, maintenance and operation, with huge engines propelled by steam or electric power, which in turn together with necessary steel rails and other equipment are manufactured in extensive shops and mills, employing great numbers of men in various and separate departments, and where the operators may never be in contact or even in sight of each other.  This is substantially true as to every other great industry.

In discussing this rule and its history the supreme court of Nebraska in the case of the *Union Pacific Railroad Company v. Erickson,* 41 Neb. 13, says:

"Probably the leading case, both in America and in England, applying the doctrine of fellow-servants to all the employes of a common master, is that of *Farwell v. Boston & W. R. Co.,* 4 Met. (Mass.), 49.  All the cases holding that broad doctrine seem to be based directly or indirectly upon the authority or reasoning of Chief Justice Shaw in that case.  It was decided in 1842, before the railway system of the country was developed, before the existence of other large corporations employing vast numbers of men engaged in the pursuit of one general object, but performing different functions and engaged in many distinct departments.  This state of affairs was then just arising, and the vast change of conditions in the relations of master and servant

was only then beginning to appear. The extent of that change and the consequences of applying old rules to new conditions could not then be foreseen. In that case, as in all others upon the subject, the reasons for the rule exempting masters from liability to servants for injuries produced by the negligence of their fellow-servants are stated as twofold; First, that such injuries must be presumed to be within the contemplation of the parties when they made their contract; and second, that public policy requires the enforcement of such a rule, upon the theory that by enforcing it each servant is made closely observant of the acts of his fellow-servants, and that the scrutiny of one another naturally tends to efficiency and care. The first reason given, where the rule is sought to be applied without discrimination to all servants of a common master, has already been completely set aside and disregarded, even by those courts in America most inclined to conservatism upon the subject. It is everywhere conceded that inasmuch as a corporation can only act through agents and all agents are servants, the logical application of the rule would discharge a corporation entirely from liability to its servants, and this gives rise to a corollary that where the negligence is that of a vice-principal whose acts must be taken as those of the master, the rule does not apply. The recognition of this exception was necessary to preserve another rule, that while a servant assumes the dangers incident to this employment, he does not assume dangers caused by the negligence of his master.''

The only case in this jurisdiction cited by counsel for appellant, as supporting its contention in this case is that of *U. P. Ry. Co. v. Kelley,* 4 Colo. App.

325.    That was a case wherein the injury complained of was that of an express messenger working on the same train with the brakeman, charged with the negligence.  It was there contended that under an agreement between the express company and the railroad company wherein the messenger was to perform services for the railroad company, that these were fellow servants.  The court gave a general definition of the term "fellow servants."  The only part of this definition applicable in that case was that "fellow servants must work under the same general control and derive authority and compensation from the same source."

The court held that the express and baggageman was not a fellow servant with the brakeman.

It is singular judicial logic that reasonably permits the citation of a case, wherein the person whose one of two principal duties is to handle and have charge of the baggage of the railroad, is held not to be a fellow servant with the brakeman who neglects to set the brakes of the car wherein the baggage man works, as supporting the contention in this case; that the brakeman of the train is a fellow servant of the shoveler of mud, a mile and a half distant.

We have been referred to no case in our courts, and we have not found any such, where the common master has been held exempt from liability for injury to one servant by the neglect of another, where it does not appear that the servants were co-operating in the particular work in which they were engaged, or were in a general way associated in such duties.

The reasoning of the courts wherein the view we adopt and apply to the facts in this case, is so

clear and so fairly stated in the case of the *Chicago & N. W. Co. v. Monanda*, 93 Ill. 302, that we quote as follows:

"The best interests of society demand that all business at all times be so conducted that the least possible harm shall be caused thereby; that all servants, and especially all servants controlling dangerous instrumentalities, shall constantly use due care. The position that the well being of society in early days demanded in such cases the rule respondeat superior was sustained upon the view then taken of the usual subordination of servants to the will of the master, and the usual devotion of the servant to the interests of the master. It seems to have been wisely thought that it would induce greater caution in servants to avoid injury to others, if servants knew that the master must answer for such injury, and also that the responsibility of the master in such case would usually incite him to greater vigilance in promoting the desired constant caution in his servants. Where servants are habitually con- sociated in their daily duties (as most servants were at an earlier day in England), they may well be supposed to have an influence over each other, and a power to promote in each other caution, by their counsel, exhortation and example, at least equal to that of the master, and perhaps greater. In such case the well being of society does not seem to demand that the master should be made to answer, in cases where he had done all that he ought to do, and the injury was to one such servant and from the negligence of another. The vigilance of such servants in such case may well be supposed to have a greater stimulant to constant exercise if each one

knows that neither he nor his comrades can have any
redress for injury to one by the negligence of the
other.  But where servants of a common master are
not consociated in the discharge of their duties;
where their employment does not require co-opera-
tion, and does not bring them together, or into such
relations that they can exercise an influence upon
each other promotive of proper caution, in such case,
the reason of the rule holding the master responsi-
ble for damage resulting from the negligence of one
of his servants seems reasonably to apply with as
great force as if a stranger were the party injured.
The influence of one servant upon another in the
encouragement of caution can not be relied upon in
such case, for that can only operate where they are
co-operating or are brought together by their usual
duties, or where there is habitual consociation.  Then,
indeed, in cases where they cannot be supposed to
have in their power in any way to promote caution
in each other, the well being of society, if it is to
have any such security, must depend entirely upon
the vigilance of the master in promoting constant
caution in each of his servants, and upon the desire
of servants to protect the master from liability.
Hence, the master must in such case be held re-
sponsible for the neglect of his servant.  *   *   *
The line of argument briefly stated is this:  The
ancient common law rule which holds a master (even
in cases where he is guilty of no fault) responsible
for the neglect of his servant, where a third person
suffers damage from the negligence of such servant,
rests entirely upon considerations of its practical
effect upon society—upon considerations of policy;
and these considerations of policy rest upon the idea

that the subordination of the servant to the will of the master, give him, under that rule, incentives to caution he would not otherwise have, and upon the idea that the rule will incite the master to greater vigilance in the selection of prudent servants, and to greater zeal in the exercise of care in all cases. When the reason of the rule ceases, the application of the rule ought also to cease; and especially is this true of a rule which rests, not upon its own justice, but solely upon considerations of policy. Where servants of the same master are directly co-operating with each other in a particular business at the time of the injury, or are, by their usual duties, brought into habitual consociation, it may well be supposed that they have the power of influencing each other to the exercise of constant caution in the master's work (by their example, advice and encouragement, and by reporting delinquencies to the master), in as great, and in most cases in greater, degree than the master. If, then, each such servant knows that neither he nor his fellow servant, if injured by the other's negligence, can have redress against the master, he has such incentive to constant care, that the well being of society in such cases does not demand that the master be made to answer. The same considerations of policy which, to avoid injuries to third persons usually demand that the master be held responsible, seem plainly not to demand it in the case of such co-servants. But though servants are employed by the same master, and are engaged in doing parts of some great work carried on by the master, still, unless either their duties are such that they usually bring about personal association between such servants, or unless they are actually co-operat-

ing at the time of the injury in the business in hand, or in the same line of employment, they have generally no power to incite each other to caution by counsel, exhortation or example, or by reporting delinquencies to the master; and the well being of society in such case must depend upon the devotion of the servant to the interests of the master, and the zeal of the master to promote a constant exercise of due care by his servant; and to bring these instrumentalities into action it becomes necessary (as in case of an injury to a stranger) to adhere to the general rule that the master must answer for the neglect of his servant, and this, as already suggested, because the facts are such that society cannot, in such case, avail itself of the mutual power and influence of one servant upon another for want of the necessary opportunity for its exercise, and hence must depend for inducements to caution which are supposed to follow the general rule of the master's liability.''

In *Daniels v. U. P. R. R.*, 6 Utah 357; 23 Pac. 762, the court tersely concludes.:

''In order to constitute servants of one master fellow servants within the rule respondeat superior they must be engaged in the same line of work, be under the control of the same foreman, be employed and discharged by the same head of the department in which they work; that they labor together in such personal relations that they can exercise an influence upon each other promotive of proper caution in respect of their mutual safety; that they shall be at the time of the injury directly co-operating with each other in the particular business in hand, or that their mutual duties shall bring them into habitual con-

sociation, as that they may exercise an influence upon each other promotive of proper caution and to be so situated in their labor to some extent.to supervise and watch the conduct of each other as to skill, diligence and carefulness."

And in *Parker v. Hannibal & St. Joe R. R.,* 109 Mo. 360, it is said:

"Guided by the real reason for the rule, it seems to us it should be applied, and applied only, in those cases where the servant injured and the one inflicting the injuries are so associated and related in their work that they can observe and have an influence over each other's conduct and can report delinquencies to a common correcting power or head. In short, they should be fellow servants in fact, and not simply in dialectic theory. If in separate and distinct departments, so that the circumstances just stated do not and cannot exist, then they are not fellow servants within any just or fair meaning of the rule."

The following are among the many cases wherein the instances are multiplied and the argument elaborated, sustaining our conclusion in this case, that the brakeman, Dugan, and the trackman, Vitello, were not fellow servants: *Gillenwater v. R. Co.,* 5 Ind. 339; *Donaldson v. Miss. & M. R. Co.,* 18 Iowa 280; *Dickerson v. Chicago & A. R. Co.,* 109 Mo. 413; 18 L. R. A. 792; *K. C. R. Co. v. Becker,* 67 Ark. 1; 46 L. R. A. 14; *Dewey v. R. R. Co.,* 97 Mich. 343; 16 L. R. A. 342; *Louisville, etc., R. Co. v. Low,* 118 Ky. 260; 65 L. R. A. 122; *Howard v. Deleware & H. Canal Co.,* 40 Fed. 195; 6 L. R. A. 75; *Smith v. Erie R. Co.,* 67 N. J. Law 636; 59 L. R. A. 302; *Louisville & N. R. Co. v. Martin,* 113 Tenn. 266; *R. R. Co. v. Hills Admr.* (Ky.), 89 S. W. 523; *Conine v. Olympia*

*Logging Co.* (Wash.), 78 Pac. 932; *Indiana, etc., R. Co. v. Otstat,* 212 Ill. 492; 72 N. E. 387; *Chicago N. W.R.Co. v. Snyder,* 117 Ill. 376; *C. B. & Q. Ry. Co. v. Kellogg,* 54 Neb. 127; *Railroad Co. v. D'Armand,* 86 Tenn. 73; *Hall v. Railroad Co.,* 39 Fed. 18; *Ill. Central R. Co. v. Hunter,* 70 Miss. 471; *L. & N. R. Co. v. Sheetz,* 11 Ky. Law 781; *C. & A. R. Co. v. Swan,* 176 Ill. 424; *American Exp. Co. v. Reisley,* 77 Ill. App. 476; 179 Ill. 295; *Pike v. Railroad Co.,* 41 Fed. 95; *Sullivan v. Mo. Pac. Ry. Co.,* 97 Mo. 113; *Railway Co. v. Hawthorne,* 146 Ill. 226; *Torain v. Railroad Co.,* 84 Va. 192; 4 S. E. 339; *Moon v. Railroad Co.,* 78 Va. 745; 49 Am. R. 401.

With the conclusions thus stated the judgment should be affirmed but there is another question which we deem it important to consider.

The Act of 1893, Sec. 2060 R. S. 1908, provides:

"Where, after the passage of this act, personal injury is caused to an employee, who is himself in the exercise of due care and diligence at the time,

\* \* \*

(3) By reason of the negligence of any person in the service of the employer who has the charge or control of any switch, signal, locomotive engine or train upon a railroad, the employee, or in case the injury results in death, the parties entitled by law to sue and recover for such damages, shall have the same right of compensation and remedy against the employer as if the employee had not been an employee of or in the service of the employer, or engaged in his or its work."

It is urged that the runaway cars in this case did not constitute a "train" within this provision.

That Dugan was at least in temporary but sole

control of these cars as thus connected, is clear. Counsel for appellant in their brief say:

"His duties, under the circumstances, were well defined and understood, his principal duty with reference to them was to remain with them, to set on them enough hand brakes to keep them in place where they were left, to look after them to see that neither cars nor their contents were interfered with, and that they were not moved, and that they did not move of themselves. He required and received no instructions as to these duties. They were the regular duties of a brakeman and were fully understood by him."

It appears that with the addition of the engine, these cars constituted the entire train when it pulled into Red Cliff.

Two of these cars were picked up at Belden Siding and pushed ahead of the engine to Red Cliff, where in the course of switching these two cars were dropped back and connected with the remaining cars, and thus formed a part of the runaway train, which consisted in all of four cars and a caboose, from which the engine had been detached at the time the cars started uncontrolled down the grade. Under this state of facts we must determine within the meaning of the statute:

1. Did the runaway cars thus standing and connected, constitute a train?

2. If so, does the term "charge or control" comprehend such a situation as is presented here?

The authorities upon this point are somewhat conflicting and its solution is not without difficulty, but upon what we regard as the better reasoning

we are compelled to answer both of these questions in the affirmative.

In the *Colo. Milling Co. v. Mitchell*, 25 Colo. 284, it is held that such a statute should be construed liberally in favor of employees, and this rule of construction seems since to have been adhered to, as will be seen by examination of the recent case of *Whittle v. D. & R. G. Ry. Co.*, 118 Pac. 971.

A careful examination of the authorities cited by counsel for appellant does not appear to sustain the contention that to constitute a train, within the meaning of the act, the locomotive must form a part of it. The first case cited, *Dacey v. Old Colony R. Co.*, 153 Mass. 112, does not so decide.

Indeed the language of the court there would seem to be to the contrary:

"The word 'train' as used in the Railroad Act, (Pub. St. C., 112), generally signifies cars in motion. Usually the power would be furnished by a locomotive. But whether a number of cars coupled together and in motion, and forming one connected whole, do or do not constitute a train, *does not depend, we think, upon whether a locomotive engine is attached to them at the time* and they are moved by the power thus supplied. The liability to accident, for which St. 1877 C., 270, was designed to furnish a remedy, would be the same in kind, though perhaps not so great in degree, whether the motive power was furnished by a locomotive attached to the cars or in some other manner."

The case of *Caron v. B. & A. R. R. Co.*, 164 Mass. 523, had to do with the employer's liability in so far as it concerned the person in charge or control, and it is the language used in the discussion of this

subject, upon which counsel rely to sustain the contention as to what constitutes a train.

The same may be said as to the case of *Thyng v. Fitchburg R. R. Co.,* 156 Mass. 13. But even should these cases go the extent argued by counsel as applied to the meaning of the word "train" in the act, and as they in fact do, upon the question of "charge or control," yet under the circumstances they cannot have weight here. If, however, the Massachusetts court in these cases has so interpreted the act, the legislature of Massachusetts in 1897 repudiated such construction of its Supreme Court, and adopted an entirely different interpretation. By this act it was provided:

Sec. 1.   One or more cars in motion, whether attached to a locomotive or not, shall constitute a train within the meaning of Clause 3 of Section 1 of Chapter 270 of the Act of 1887 and the acts in addition thereto or in amendment thereof.

Sec. 2.   Any person who, as a part of his duty for the time being, physically controls or directs the movement of a signal, switch or train, shall be deemed to be a person in charge or control of the signal, switch or train within the meaning of Clause 3 of Section 1 of Chapter 20 of the Acts of the year 1887 and the acts in addition thereto or in amendment thereof."

Acts of 1897, Ch. 491.

It will be observed that this was purely an act of interpretation and construction. It must be conceded that the interpretation given by the legislature controls in Massachusetts, and that the cases cited to that extent are no longer in force in that state. If, therefore, we are to consider any construction

from that jurisdiction it should be that which is alive and in force, rather than one that is repudiated and now obsolete.

The case of *R. R. Co. v. Ross,* 112 U. S. 377, cited by counsel is hardly in point. That was a case involving an injury to the engineer of a freight train as a result of a collision caused by the neglect of the conductor of the train in failing to give to the engineer the running orders which he, the conductor, had himself received. Mr. Justice Field, speaking for the court in that case, held the company to be liable. It is the language used by the court in discussing the question of control, under that particular state of facts, which counsel for appellee quote. This language cannot well have bearing upon the state of facts presented in this case, and the statute now under consideration was not then in existence.

In the case of *Louisville and Nashville R. R. Co. v. Goss,* 137 Alabama 317, cited by counsel for appellant and in discussing the question of charge or control, in the very language quoted by counsel in their brief it is said:

"The principle deducible from these cases is that a fireman may be said to be in charge or control of an engine, within the meaning of subdivision five, although the engineer be personally present on it, where, under the particular circumstances in its operation and movement, his duties as fireman require him to do that which is necessary to its proper and safe operation and only to that extent. In such a case the negligent performance of the required duty, or the negligent failure to perform, resulting in injury to a fellow employe, would fix upon

the master a liability, provided that with reference to the act producing the injury the person guilty of negligence occupied the position of one in charge or control of the machinery.''

If this be the law in the case of a fireman, even though the engineer be personally present and on his engine, what must be the conclusion in case of a brakeman left in sole charge by the conductor, and in the absence of the latter, as in the case at bar, where the admitted duties of the brakeman in that respect are as before recited. If a train must of necessity include an engine as a constituent part of it, what can we say was the purpose of the act in using the words ''locomotive engine or train.'' The reasonable conclusion seems to be well stated in Labatt on Master and Servant, Section 705, as follows:

''In a recent case Lord Halsbury doubted very much whether the applicability of the word 'train' depends upon the number of carriages or the number of vehicles going upon wheels which the locomotive was taking along the railway. He thought the legislature intended a very wide scope to be given to the language used, and that 'speaking in a general way the legislature meant that a locomotive engine by itself, or anything that was drawn along a railway, or was in course of being drawn along a railway by that locomotive engine' should be included in the word.''

Certainly if Dugan had set the hand brakes he could have prevented the movement of the cars. Therefore, by the performance of his duty he could have controlled their movement, which resulted in the injury. If it was his duty to control, and if in

the exercise of that duty he had the power to control, then he was in control. The negligence in the failure to prevent the moving of the cars is certainly as important as would have been the negligent movement of the cars.

"The statute points directly to the person having the charge or control of the train as being that person who, at the time when the negligent act is committed, has the duty laid upon him of performing that act with reasonable care." *McCord v. Cammell R. Co.*, App. Cases, (1896, p. 57).

"The words 'charge' and 'control' should be construed as they are written, separately and with distinct meaning. They are applicable to both men and machinery, and from the context must bear necessarily the sense of authority to direct men by orders and of power to direct machinery by physical force. They are apt words, therefore, to describe the duties of a conductor of a train, an engineer of a locomotive, or a signal man in his box. There is no inconsistency in one person having the general charge and another the physical control, over any of the equipment mentioned, and either or both being negligent." Id.

It seems to be the reasonable construction of the provision of the statute under consideration, giving to the language its usual and ordinary meaning, that under the facts in this case, the runaway cars constituted a train within its meaning, and that Dugan was in charge or control.

It appears to us that this conclusion is supported in principle in the case of *Whittle v. D. & R. G. Ry. Co., supra.* In that case the depot agent had neglected to convey the order of the train dispatcher

either by word or signal to the conductor of the train
and which neglect caused the collision. Mr. Jus-
tice Gabbert speaking for the court and in constru-
ing sec. 2056 R. S. 1908, said:

"Had it been the purpose of the statute to limit
its provisions to the employes in the immediate
charge of a train, it would have so declared, in-
stead of using the expression 'any officer, agent,
servant or employe whilst running, conducting or
managing any  *  *  ᴬ  train of cars.' 'Manag-
ing' as defined by Webster, is 'to have under con-
trol and direction;  *  *  *  to guide.' The em-
ployes in the actual charge of a train stop, start,
and advance it, and in so doing are running, con-
ducting, and managing it; but, according to the aver-
ments of the complaint, they are not in the absolute
control or management of the train which they are
running or conducting. On the contrary, they ad-
vance, stop, and start their trains under the di-
rections of the train dispatcher, communicated to
them by its station agent, to whom such directions
are sent, by means of signals displayed, and deliv-
ering to them the directions of the dispatcher; so
that the movement of trains is directed and con-
trolled (1) by those who direct their movements,
and (2) by the employes whose duty it is to run their
trains in obedience to such directions."

See also *Welsh v. N. Y. & H. R. Ry.*, 176 Mass.
176; *Dresser Employers Liability,* Secs. 332-336;
*Cox v. Great Western Ry. Co.*, 9 S. B. Div. 106.

Judges Cunningham and Hurlbut concur in the
views as above expressed. Judges King and Walling
concur in the affirmance of the judgment, but only
on the ground that, in the circumstances disclosed

by the evidence in this case, the brakeman Dugan was a "person in the service of the employer" having "the control of a train upon a railroad," within the meaning of the third subdivision of section one of the act of 1893, quoted in the opinion of the court.

The judgment is affirmed.      *Affirmed.*